Amy Ghosh, SBN # 201701
Law Offices of Amy Ghosh
3255 Wilshire Blvd., Suite #1530
Los Angeles, CA 90010
Phone: 213-365-2370
Fax: 213-389-6931
Email: amygesq@gmail.com

Attorney for Defendants:
XYRIS ENTERPRISE, INC;
ATKINSON CARE HOME;
MUQUET DADABHOY;
TERESITA CASTANEDA

UNITED STATES DISTRCIT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDGARDO SEMINIANO | CASE NO.: CV10 1673 PSG (JEMx) |
| Plaintiff, | **DECLARATION OF MUQUET DADABHOY IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| XYRIS ENTERPRISE, INC; ATKINSON CARE HOME; MUQUET DADABHOY; TERESITA CASTANEDA, | **Date: Jan 03, 2010** **Time: 11:00 a.m.** **Department: 10A** **Judge: Hon. J. Tucker** |
| Defendants | |

I, Muquet Dadabhoy, declare and state as follows:

1. I own and operate the assisted living care facility, Atkinson Care Home, located at 17035 Atkinson Avenue, Torrance, CA 90504.

2. In the underlying suit, Edgardo Seminiano is bringing a claim based on his employment at Atkinson Care Home between July 29, 2008, and December 2, 2009.

3. He has lived at the facility throughout his time working for Atkinson Care Home.

4. Atkinson Care Home was at that time, and still is, a licensed residential care facility for the elderly.

5. Although Atkinson Care Home was legally obligated to operate for 24 hours per day, 7 days per week, Edgardo was only employed to work 40-hours per week, and only required to stay on the premises for those hours.

6. Edgardo only remained on the premises of Atkinson Care Home beyond work hours for non-work-related reasons because that is where he was housed and had access to food. He was never required to stay beyond his normal work hours. In fact, he was away from Atkinson Care Home regularly and frequently for non-work related, personal reasons.

7. Edgardo started working for Atkinson Care Home sometime in 2003. In June 2003, when the work relationship began, we entered into an in-kind wage agreement. I agreed to provide and Edgardo agreed to accept housing and living expenses along with $1800 per month as salary. He would receive this compensation and additional payments by cash and check in lieu of regular cash payments for working 40 hours per week at minimum wage.

8. This payment arrangement was done at Edgardo's request.

9. Edgardo received living accommodations and was paid $1800 each month by check and cash. He also received additional amounts of money that would be hard to prove as they were paid in cash.

10. After bringing his suit against us, Edgardo contacted me to negotiate an out-of-court settlement of the matter.

11. Edgardo's attorney knew he wanted to settle with me and was placing a great deal of pressure on him not to settle. His attorney told him not to speak with me or a mutual acquaintance who was listed in my Initial Disclosure.

12. The deposition scheduled for August 12 was continued to September 30, 2010 because I had a family emergency (my uncle fell ill). I made plans to go to Pakistan, but before I could leave, I received news that my uncle had passed away, so I cancelled my trip.

13. However, the deposition scheduled for September 30th was cancelled by Plaintiff's attorney without an explanation. It seems, based on information revealed to me by Edgardo, that the reason the deposition was cancelled was because Plaintiff had told his attorney that a settlement had occurred.

14. Two days before the scheduled deposition Edgardo and I spoke, and he said that he had made up his mind and wanted to settle. I told him to call me tomorrow to discuss things.

15. The next day Edgardo called me and we made arrangements to meet at a Filipino restaurant at the crossing of Carson and Vermont. We met and had a meal together; things were fine, just as though there were no law suit between us.

16. During our conversation at the restaurant, Edgardo said that he sued me because he was afraid of being fired. I told him that I had not planned to fire him. He then explained to me that he wanted to go back to the Philippines and that $12,000 would be enough. He was afraid of how the case would turn out because his attorney was putting words in his mouth.

17. By the end of the meal, Edgardo had agreed to settle the matter for $12,000. I told him I would speak to my attorney, however, Edgardo did not want to involve his own attorney. Therefore, we decided that we would resolve this matter outside of the court, not involving our attorneys, so we called a paralegal and scheduled a meeting with her.

18. We both went to the paralegal's office the same day. Together, at her office, we made changes to the sample agreement the paralegal had created, so that it would reflect our settlement. We then executed the agreement in front of the paralegal/notary public.

19. After we executed the agreement, I asked him whether he would inform his attorney and he said that he did not want to face his attorney by phone or in person and preferred to send him a letter. Thereafter, Edgardo decided to use the paralegal's services to have her draft a letter to his lawyer.

20. On November 01, 2010 after the hearing, I knocked on the door of the room in which Edgardo was meeting with his attorney and asked him whether he wanted me to wait for him so that I could drop him off at home, as he had opted to get a ride to the courthouse with me in the first place. In response to my inquiry, Attorney Rihn threatened both Edgardo and myself by answering for Edgardo, saying that Edgardo was not going *anywhere* with me today.

21. Edgardo later told me that his attorneys called him a fool for settling with me for "little" money.

22. Edgardo later told me that during that meeting with his attorneys, when he told his attorneys that he no longer wished to pursue the case, Rihn came very close to his face. Edgardo said he felt he was being pressured. The attorneys then suggested that they drop him home, but Edgardo declined the offer. The attorneys continued to pressure him to accept their offer of dropping him home.

23. Edgardo has informed me numerous times that he does not want to proceed with this litigation and he has informed his attorneys.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this Dec 6, 2010, at Los Angeles, California

Declaration of Muquet Dadabhoy
4